Civil Case No. 07-cv-05998-GBD

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

*In re* SOLUTIA, INC., et al., *Debtors.*

## AD HOC COMMITTEE OF SOLUTIA NOTEHOLDERS, *Appellant,*

v.

SOLUTIA, INC., *Appellee.*

---

*Appeal From the United States Bankruptcy Court
for the Southern District of New York*

Adv. Pro. No. 05-01843 (PCB)

---

## AD HOC COMMITTEE OF SOLUTIA
## NOTEHOLDERS' OPENING BRIEF

---

HENNIGAN, BENNETT & DORMAN LLP
Bruce Bennett (admitted *pro hac vice*)
Bennett J. Murphy (BM-8485)
Joshua D. Morse (admitted *pro hac vice*)
865 South Figueroa Street, Suite 2900
Los Angeles, California  90017
Telephone:  (213) 694-1200
Facsimile:  (213) 694-1234


*Counsel for Appellant Ad Hoc Committee of Solutia Noteholders*

# TABLE OF CONTENTS

**(Page)**

I.     STATEMENT OF BASIS OF APPELLATE JURISDICTION ................1

II.     STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL
      AND APPLICABLE STANDARD OF APPELLATE REVIEW .............1

III.    STATEMENT OF THE CASE ..................................................4

     A.     Nature of the Case. ...................................................4

     B.     The Course of the Proceedings and Disposition by the
           Bankruptcy Court .................................................5

IV.    STATEMENT OF THE FACTS RELEVANT TO APPEALS .................7

     A.     The Issuance of the Notes in 1997. ....................................7

           1.     Solutia's Creation and Capitalization. ....................................7

           2.     Solutia's Express Agreement With Noteholders Not
               to Create a Material Senior Lien in Protected
               Assets. .................................................8

     B.     Solutia's Worsening Financial Condition. .......................................11

     C.     Solutia's Grant of Liens in the Protected Assets in 2002. ..............12

     D.     Solutia's Need for Further Financial Restructuring. ......................13

     E.     Solutia's Decision to Release the Noteholders' Lien as
           Part of Its Deleveraging Strategy. ..................................................16

     F.     The Anniston Litigation Settlement. ..............................................19

     G.     The Refusal of Mainstream Lenders to Participate in the
           Release of the Noteholders' Lien. ..............................................21

     H.     The Structuring of the Ableco Loans. .............................................22

     I.     The Release of the Noteholders' Lien on the Protected
           Assets. .................................................24

     J.     Solutia's Implementation of Its Deleveraging Strategy
           Following Release of the Noteholders' Lien. ..................................26

# TABLE OF CONTENTS (cont'd)

**(Page)**

    1.    Solutia Organizes a Noteholder Group After Release of the Noteholders' Lien and Clears the Remaining Obstacles to Filing for Bankruptcy Protection. ....................................................................26

    2.    Solutia's Bankruptcy Loans. ...................................27

    3.    The Indenture Trustee's Reservation of Rights. ...................29

    4.    Solutia's Implementation of the Deleveraging Strategy in Bankruptcy. ...........................................29

V.    SUMMARY OF ARGUMENT ..................................................31

VI.    ARGUMENT ...........................................................................32

    A.    The Bankruptcy Court Erred in the Interpretation of the Indenture. ..........................................................34

    B.    The Bankruptcy Court Erred by Failing to Determine Whether Solutia's Conduct Breached the Covenant of Good Faith and Fair Dealing. ...........................................37

        1.    The Applicable Legal Standards Under the Covenant of Good Faith and Fair Dealing. ..........................37

        2.    The Bankruptcy Court Erred by Holding the Covenant of Good Faith and Fair Dealing Did Not Apply. ...................................................................40

        3.    The Bankruptcy Court Erred by Declining to Analyze Whether Solutia's Conduct Deprived Noteholders of the Bargained–For Fruits of the Indenture. ...........................................................41

        4.    The Bankruptcy Court Erred by Declining to Analyze Whether Solutia's Conduct was Contrary to the Noteholders' Reasonable Expectations. ..................43

        5.    The Bankruptcy Court Misapplied The Law in the Memorandum Decision. ........................................44

VII.    CONCLUSION ........................................................................48

# TABLE OF AUTHORITIES

**(Page)**

## Cases

*511 West 232nd Owners Corp. v. Jennifer Realty Co.*,
   98 N.Y.2d 144, 773 N.E.2d 496 (Ct. App. 2002) ........................................ 38, 42

*Andrew Crispo Gallery, Inc. v. C.I.R.*,
   86 F.3d 42 (2d Cir. 1996) ................................................................................3

*Bank of China v. Chan*,
   937 F.2d 780 (2d Cir. 1991) ...................................................................... 41, 43

*Bellefonte Reinsurance Co. v. Aetna Casualty and Surety Co.*,
   903 F.2d 910 (2d Cir. 1990) ..........................................................................34

*Broder v. Cablevision Sys. Corp.,*
   418 F.3d 187 (2d Cir. 2005)) ..........................................................................48

*Carvel Corp. v. Diversified Mgmt. Group, Inc.*,
   930 F.2d 228 (2d Cir. 1991) ..........................................................................40

*Cross & Cross Properties, Ltd. v. Everett Allied Co.*,
   886 F.2d 497 (2d Cir. 1989) ..........................................................................40

*Dalton v. Educ. Testing Services*,
   87 N.Y.2d 384 (Ct. App. 1995) .................................................................. 42, 43

*Don King Production, Inc. v. Douglas*,
   742 F. Supp. 741 (S.D.N.Y. 1990) ..................................................................41

*Downtown Athletic Club, Inc. v. Caspi Dev. Corp.*
   (*In re Downtown Athletic Club, Inc.*), No. 98 B 41419,
   1998 WL 898226 (Bankr. S.D.N.Y. Dec. 21, 1998) ...........................................47

*Dweck Law Firm, L.L.P. v. Mann*,
   340 F.Supp.2d 353 (S.D.N.Y. 2004) ................................................................37

*Filner v. Shapiro*,
   633 F.2d 139 (2d Cir. 1980) ..........................................................................37

## TABLE OF AUTHORITIES (cont'd)

**(Page)**

*Gil Enters. v. Delvy*,
   79 F.3d 241 (2d Cir. 1996) ..................................................................3

*Hartford Fire Ins. Co. v. Federated Department Stores, Inc.*,
   723 F. Supp. 976 (S.D.N.Y. 1989) ................................................. 45, 46

*Havel v. Kelsey-Hayes Co.*,
   445 N.Y.S.2d 333 (4th Dep't. 1981) ............................................. 41, 43

*In re Enron Corp.*,
   292 B.R. 507 (S.D.N.Y. 2002) ...........................................................3

*In re Smart World Tech., LLC*,
   423 F.3d 166 (2d Cir. 2005) ...............................................................3

*In re St. Casimir Dev. Corp.*,
   358 B.R. 24 (S.D.N.Y. 2007) .............................................................3

*Interallianz Bank AG v. Nycal Corp.*,
   No. 93 CIV. 5024, 1994 WL 177745 (S.D.N.Y. May 6, 1994) ..........................43

*Jenkins v. Red Clay Consol. Sch. Dist.*,
   4 F.3d 1103 (3d Cir. 1993) ...............................................................3

*M/A-COM Sec. Corp. v. Galesi*,
   904 F.2d 134 (2d Cir. 1990) ......................................................... 38, 41

*Mellencamp v. Riva Music Ltd.*,
   698 F.Supp. 1154 (S.D.N.Y. 1988) .....................................................43

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*,
   716 F. Supp. 1504 (S.D.N.Y. 1989) ............................................. 44, 45, 46

*Nat'l Westminster Bank v. Ross*,
   130 B.R. 656 (S.D.N.Y. 1991) ..........................................................47

*Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co.*,
   680 F.2d 933 (3d Cir. 1982) ............................................................47

*Rowe v. Great Atl. & Pac. Tea Co.*,
   46 N.Y.2d 62 (1978) .....................................................................43

## TABLE OF AUTHORITIES (cont'd)

**(Page)**

*Sabetay v. Sterling Drug, Inc.*,
   69 N.Y.2d 329 (1987)..........................................................................................47

*Scalisi v. Fund Asset Mgmt., L.P.*,
   380 F.3d 133 (2d Cir. 2004) ................................................................................4

*Senator Linie GMBH & Co. K.G. v. Sunway Line, Inc.*,
   291 F.3d 145 (2d Cir. 2002) ................................................................................3

*Shamis v. Ambassador Factors Corp.*,
   No. 95 CIV 9818, 2000 W.L. 1368049 (S.D.N.Y. Sept. 21, 2000) ....................43

*State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*,
   246 F.Supp.2d 231 (S.D.N.Y. 2002) ..................................................................47

*Suthers v. Amgen, Inc.*,
   441 F.Supp.2d 478 (S.D.N.Y. 2006) ..................................................................47

*Travellers Int'l v. Trans World Airlines, Inc.*,
   41 F.3d 1570 (2d Cir. 1994) ..............................................................................40

*United States of America v. McCombs*,
   30 F.3d 310 (2d Cir. 1994) ..................................................................................3

*Van Gemert v. Boeing Co.*,
   520 F.2d 1373 (2d Cir. 1975) ............................................................................46

*Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g. Co.*,
   30 N.Y.2d 34 (1972).........................................................................................38

**Statutes**

11 U.S.C. § 363 ......................................................................................... 5, 30

11 U.S.C. § 1109 ...........................................................................................5

28 U.S.C. § 158(a)(1)....................................................................................1

## TABLE OF AUTHORITIES (cont'd)

<u>**(Page)**</u>

### Rules

Fed. R. Bankr. P. 7024 ....................................................................................5

Fed. R. Civ. P. 24 ...........................................................................................5

### Other Authorities

11 *Williston on Contracts* § 1295 (3d ed.)..............................................43

American Bar Foundation, Corporate Debt Financing Project,
    *Commentaries on Model Debenture Indenture Provisions*,
    § 10-10 (1971) ..........................................................................35

Carl S. Bjerre, *Secured Transactions Inside Out: Negative Pledge Covenants,*
    *Property and Perfection*, 84 Cornell L. Rev. 305 (1999) ....................35

Felicia Smith, *Securities Symposium Issue: Applicability of the*
    *Securities Act of 1933 and the Trust Indenture Act of 1939*
    *to Consent Solicitations to Amend Trust Indentures*,
    35 How. L.J. 343 (1992).............................................................36

Matthew H. Hurlock, *New Approaches to Economic Development:*
    *The World Bank, the EBRD, and the Negative Pledge Clause*,
    35 Harv. Int'l L.J. 345 (1994) ......................................................35

## I.    STATEMENT OF BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction, pursuant to 28 U.S.C. § 158(a)(1), to hear this appeal of the Final Judgment (the "Judgment") [Adv. Docket No. 147][1] entered in the Adversary Proceeding pending before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") as *Wilmington Trust Company, as Successor Indenture Trustee to JPMorgan Chase Bank, N.A v. Solutia, Inc.*, Adversary Proceeding Number 05-01874 (the "Adversary Proceeding"), which is a final order (for purposes of appeal) entered by the Bankruptcy Court on May 17, 2007.

## II.    STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL AND APPLICABLE STANDARD OF APPELLATE REVIEW

The proceedings below concerned actions by Solutia to release a lien securing $450 million of public notes. The central disputes at trial were whether Solutia released the lien consistently with its obligations under the indenture for the notes and under the covenant of good faith and fair dealing implied in every contract under New York law.

The Bankruptcy Court held after trial that the release was "not prohibited" by the indenture for the notes and that the covenant of good faith

---

[1]    As used herein, (a) "[Adv. Docket No. ___]" refers to the designated items of the record of this Appeal that were filed on the Docket of the Adversary Proceeding (as defined herein), identified by Docket Number; (b) "[Docket No. ___]" refers to the designated items of the record of this Appeal that were filed on the Docket in the Bankruptcy Cases (as defined herein), identified by Docket Number; (c) "[PX __]" refers to the designated items of the record of this Appeal that were admitted as Trial Exhibits for the Plaintiff in the Adversary Proceeding, identified by Trial Exhibit Number; (d) "[DX __]" refers to the designated items of the record of this Appeal that were admitted as Trial Exhibits for the Defendant in the Adversary Proceeding, identified by Trial Exhibit Number; and (e) "[Memorandum Decision __]" refers to the Bankruptcy Court's Memorandum Decision After Trial [Adv. Docket No. 146]. (as amended, the "Memorandum Decision").

and fair dealing did not apply.  The Bankruptcy Court also held that the absence of a breach of the indenture for the notes foreclosed the Trustee's claims for equitable relief as well as for adequate protection.  The Bankruptcy Court did not address the Trustee's other grounds for relief.

The issues for appeal addressed herein are:

1.  Whether the Bankruptcy Court erred as a matter of law in construing the Indenture, dated as of October 1, 1997 [PX 3] (the "Indenture"), between Appellee Solutia Inc. ("Solutia"), and the predecessor to Appellant Wilmington Trust Company, as Indenture Trustee (the "Trustee"), The Chase Manhattan Bank, as Trustee.  The Court held that the "plain and clear" meaning of the Indenture was that a lien is released automatically, without action by Solutia or any party.  The Indenture does not provide for this, nor contain any other language authorizing release without the Trustee's consent.

2.  Whether the Bankruptcy Court applied an erroneous legal standard in holding that Solutia's conduct was not subject to the covenant of good faith and fair dealing.  The Court so held on the basis of its erroneous "automatic release" interpretation of the Indenture, and because it held the covenant did not apply because the release was "not prohibited" by the Indenture.

3.  Whether the Bankruptcy Court erred in failing to evaluate Solutia's conduct under the covenant of good faith and fair dealing.  Under controlling law, the Court was required to determine whether the release deprived the holders of the Notes (the "Noteholders") of the "bargained-for fruits" of the Indenture and was consistent with their reasonable expectations under the Indenture, or was merely an exercise of contractual rights having an

"incidental effect" on the Noteholders' interest.  Because it erroneously concluded the covenant did not apply, the Bankruptcy Court never addressed the legal standard applicable under controlling law.

The Bankruptcy Court's conclusions of law that supported its dismissal of the Trustee's legal and equitable claims are subject to *de novo* review.  *See In re Smart World Tech., LLC*, 423 F.3d 166, 174 (2d Cir. 2005); *In re St. Casimir Dev. Corp.*, 358 B.R. 24, 35 (S.D.N.Y. 2007).  This Court also reviews the court's construction of the Indenture *de novo*.  *Gil Enters. v. Delvy*, 79 F.3d 241, 245 (2d Cir. 1996) ("review[ing] the district court's construction of contract language *de novo*"); *In re Enron Corp.*, 292 B.R. 507, 510 (S.D.N.Y. 2002) (the district court reviews *de novo* a bankruptcy court's interpretation of contract where "no extrinsic evidence was considered").

The Bankruptcy Court's findings based on its application of an improper legal standard or its mistaken impressions of the applicable rule of law or the legally relevant facts are subject to plenary review by this Court. *See Andrew Crispo Gallery, Inc. v. C.I.R.*, 86 F.3d 42, 45-46 (2d Cir. 1996); *Jenkins v. Red Clay Consol. Sch. Dist.*, 4 F.3d 1103, 1116-17, 1123 (3d Cir. 1993).  The Court should not hesitate to apply plenary review to the result of a bench trial where, as here, "the result does not jibe with the applicable rule of law."  *United States of America v. McCombs*, 30 F.3d 310, 316-17 (2d Cir. 1994); *Senator Linie GMBH & Co. K.G. v. Sunway Line, Inc.*, 291 F.3d 145, 151-52 (2d Cir. 2002) (factual findings of trial court can be set aside where they are the product of an erroneous view of the law).  And where, as here, "a challenge is made to the legal precepts applied by the [lower] court in making a discretionary determination, plenary review of the . . . court's choice and interpretation of those legal precepts is

appropriate." *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 137 (2d Cir. 2004).

## III.    STATEMENT OF THE CASE

### A.    Nature of the Case.

This appeal arises out of the Adversary Proceeding, which was brought in the jointly administered chapter 11 bankruptcy cases of Solutia and its fourteen (14) debtor subsidiaries (collectively, the "Debtors"). The Debtors commenced voluntary cases (the "Bankruptcy Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on December 17, 2003. [PX 73, ¶13; Memorandum Decision at 3]. The Debtors manufacture a wide variety of chemical and polymer-based products [Docket No. 3831 at 25-26], and had net annual sales of approximately $2.9 billion for the fiscal year ended December 31, 2006. [*Id*. at 60]. Most of the Debtors' products are produced at seven (7) manufacturing facilities located in the United States. [*Id*. at 73-80]. The physical plant, real property and manufacturing equipment comprising these domestic manufacturing facilities (defined in the Indenture as the "Principal Properties") included, at all times material to these proceedings, Solutia's manufacturing facilities located in (a) Martinsville, Virginia; (b) Pensacola, Florida; (c) Trenton, Michigan; (d) Springfield, Massachusetts ("Indian Orchard"); (e) Decatur, Alabama; (f) Greenwood, South Carolina; and (g) Alvin, Texas ("Chocolate Bayou"). [PX 74 at 14, 20; PX 64 at 27]. Solutia also conducts business through direct and indirect subsidiaries, including CP Films, Inc. ("CP Films"), a wholly-owned subsidiary with net annual sales of approximately $214 million (or 7% of the Debtors' total net sales) for the fiscal year ended December 31, 2006. [Docket No. 3831 at 77-78.]

This appeal is brought by the *Ad Hoc* Committee of Solutia Noteholders (the "Noteholders' Committee"), as Intervenor in the Adversary Proceeding pursuant to 11 U.S.C. § 1109 and Rule 24 of the Federal Rules of Civil Procedure.[2]  A related appeal (the "Trustee Appeal," and together with the Appeal, the "Appeals") has been brought by the Trustee, as successor indenture trustee to JPMorgan Chase Bank, N.A. ("JPMorgan").  [Adv. Docket No. 149].  The interests of the Noteholders' Committee and the Trustee are aligned in the Appeals.

### B.    The Course of the Proceedings and Disposition by the Bankruptcy Court

On May 27, 2005, JPMorgan initiated the Adversary Proceeding by filing a complaint against Solutia.  [Adv. Docket No. 1; PX 72].  JPMorgan sought:  (i) a declaratory judgment that the Notes are entitled to be secured by a lien upon certain of Solutia's assets, including, among other things, the Principal Properties and the stock of CP Films and other subsidiaries (defined below as the Protected Assets); and (ii) adequate protection of such lien pursuant to section 363 of the Bankruptcy Code.  [*Id.*].

The Noteholders' Committee intervened by reason of its direct pecuniary interest in the Adversary Proceeding.  [Adv. Docket No. 75].  At the time of trial, its members held Notes with an aggregate face amount of approximately $308 million (or 68.4% of the outstanding Notes).  [Adv. Docket No. 151 at 3].  The Bankruptcy Court approved the intervention of the Noteholders' Committee in the Adversary Proceeding pursuant to the

---

[2]    Rule 24 is applicable to the Adversary Proceeding pursuant to Rule 7024 of the Federal Rules of Bankruptcy Procedure.

Stipulation Regarding the Ad Hoc Committee of Solutia Noteholders' Motion to Intervene; Order Thereon. [Adv. Docket No. 75].[3]

Trial of the Adversary Proceeding began on May 23, 2006. [Adv. Docket No. 104]. Over fourteen (14) days of trial, concluding on July 10, 2006, the Bankruptcy Court heard testimony from seven (7) witnesses and argument from the parties. [Adv. Docket Nos. 104-06, 108, 111-13, 116, 118-19, 120-22. 135, 139, 156, 163]. The parties submitted post-trial briefs on August 9, 2006. [Adv. Docket Nos. 123-25, 127-29, 131].

On May 1, 2007, the Bankruptcy Court entered its Memorandum Decision. [Memorandum Decision].[4] On May 17, 2007, the Bankruptcy Court entered the Judgment, dismissing the Adversary Proceeding. [Adv. Docket No. 147].

On May 29, 2007, the Trustee and the Noteholders' Committee each filed a Notice of Appeal with respect to the Judgment. [Adv. Docket Nos. 149 and 150]. On June 8, 2007, the Trustee and the Noteholders' Committee filed identical Designations of Items to be Included in Record on Appeal and Statements of Issues Presented. [Adv. Docket Nos. 153 and 154].

The Trustee Appeal was assigned to this Court. The Appeal was initially assigned to the Honorable Loretta A. Preska. On July 13, 2007, a Notice of Reassignment was entered, reassigning the Appeal to this Court.

---

[3]  The Bankruptcy Court also approved intervention in the Adversary Proceeding by the Official Committee of Unsecured Creditors of Solutia Inc., et al. (the "Creditors Committee") [Adv. Docket No. 72], and the Ad Hoc Solutia Trade Claims Committee (the "Trade Claims Committee"). [Adv. Docket No. 62].

[4]  Non-material changes were made to the Memorandum Decision pursuant to the Errata Order Regarding Memorandum Decision After Trial entered in the Adversary Proceeding on May 22, 2007. [Adv. Docket No. 148].

Concurrently herewith, the Trustee is filing its Opening Brief (the "Trustee Opening Brief") in the Trustee Appeal and the Trustee and the Noteholders' Committee are moving for expedited treatment of the Appeals.

## IV.    STATEMENT OF THE FACTS RELEVANT TO APPEALS

### A.    The Issuance of the Notes in 1997.

#### 1.    Solutia's Creation and Capitalization.

Solutia was created in a corporate spin-off from what was then known as Monsanto Company ("Old Monsanto") in late 1997 [Memorandum Decision at 3; PX 25 at 1].  Prior to the spin-off, Old Monsanto had four historical business lines: chemicals products, agricultural products, pharmaceutical products, and food ingredients.[5]  [Docket No. 3831 at 26]. Old Monsanto's chemicals business had produced some of the most deadly toxic agents known to environmental science, e.g., asbestos, dioxin and PCBs. [*Id*. at 95-97].  As a result, Old Monsanto faced major environmental tort claims and remediation costs.  [*Id*.].  Old Monsanto was also liable for retirement and health benefits associated with the chemicals business.  [*Id*. at 46-48, 57-58, and 59; *see also* Docket No. 23 at 4].  These liabilities related to Old Monsanto's pre-spinoff business came to be known as the "Legacy

---

[5]    In December 1999, Old Monsanto was acquired by Pharmacia & Upjohn, Inc.  [Docket No. 3831 at 27].  Transactions related to such acquisition effectuated in 2000 resulted in Old Monsanto's agricultural business being placed in a new entity, originally named Monsanto Ag Company and later changed to Monsanto Company (commonly referred to throughout the Bankruptcy Cases as "Monsanto").  [*Id*.].  Old Monsanto's pharmaceutical business remained in Old Monsanto, which was renamed Pharmacia. [*Id*.].  In April 2003, Pharmacia was acquired by and became a wholly-owned subsidiary of Pfizer Inc.  [*Id*. at 28].

The term "Old Monsanto " is used to reflect the fact that subsequently, the company's agricultural products business was spun off to a new corporation which was renamed and now operates as Monsanto Company.  As indicated immediately above, Old Monsanto now is named and operates as Pharmacia Corporation.

Environmental Liabilities" and "Legacy Retirement Liabilities," and, together, the "Legacy Liabilities."

In order to exit the chemicals business upon which it had been founded and grown to be a company with net annual sales in 1996 of $9.6 billion, Old Monsanto spun off that business line and created Solutia.  [Docket No. 3831 at 26-27].  The spin-off was structured to place the Legacy Liabilities on Solutia even though it had never conducted the business that gave rise to them.  [PX 25 at 1, 9].

Following the spin-off, Solutia was capitalized by bank loans and public debt.  [PX 3; PX 74].  In particular, Solutia issued two public debentures pursuant to the Indenture: (i) $150 million in 6.72% notes due October 15, 2037; and (ii) $300 million in 7.375% notes due October 15, 2027 (collectively, the "Notes").  [Memorandum Decision at 3-4; PX 3].

### 2. Solutia's Express Agreement With Noteholders Not to Create a Material Senior Lien in Protected Assets.

Solutia obtained financing on both a secured and unsecured basis.  Its secured bank debt had the benefit of a lien on designated assets, sometimes called a "pledge" of or "security interest" in assets.  The lien gave the banks priority in right of payment as to the value of the designated assets and the right to obtain the value of the liened assets upon default, such as by sale to satisfy the debt.  The value in liened assets in excess of the secured debt, if any, and the value of unliened assets, was available to pay Solutia's unsecured debt.

The Notes were issued as unsecured debt initially, but had the benefit of a term of the Indenture assuring that the value of certain designated assets would be available to pay the Notes rather than be subject to a material senior

lien securing debt owed to a third party.  [Memorandum Decision at 4; PX 3, § 1008 at 44-45].  This term was in a common form for public debt known as a "negative pledge."  The assets designated for protection under the negative pledge were the Principal Properties (i.e., the plant property and equipment at Solutia's seven U. S. manufacturing facilities, where it produced the vast majority of its products), plus the stock owned by and the debt owed to Solutia by its principal subsidiaries, including the highly profitable CP Films subsidiary (the "Subsidiary Collateral," and together with the Principal Properties, the "Protected Assets").  [PX 3].

The operative language of the Negative Pledge is comprised of three clauses:

> **[Solutia] will not . . . create, incur, issue, assume, guarantee or secure any notes, bonds, debentures or similar evidences of indebtedness for money borrowed . . . [defined as "Debt"], secured by any pledge of, or mortgage, lien, encumbrance or security interest on . . . , any Principal Property owned or leased . . . or on any shares of stock or Debt of any Restricted Subsidiary . . . ,**

> **without effectively providing that the [Notes] . . . shall be secured equally and ratably with (or prior to) such secured Debt . . . , so long as such secured Debt shall be so secured,**

> **unless, after giving effect thereto, the aggregate principal amount of all such secured Debt then outstanding plus Attributable Debt of the Company and its Restricted Subsidiaries in respect of sale and leaseback transactions . . . would not exceed an amount equal to 15% of Consolidated Net Tangible Assets . . .**

[PX 3 § 1008 at 44-45 (emphasis added)].[6]

The first clause of the Negative Pledge stated a general rule prohibiting Solutia from granting any lien on the Protected Assets.  [*Id*.].  The second, "Equal and Ratable" clause allowed Solutia to grant a lien on the Protected Assets to secure debt owed to a third party if it "effectively provid[ed]" that the Notes would be equally and ratably secured with that debt.  [*Id*.].  The third clause excepted Solutia from the requirement to "effectively provid[e]" the equal and ratable lien if the third party debt was secured by a non-material lien.  [*Id*.].  This was defined as a lien of not more than 15% of Solutia's "Consolidated Net Tangible Assets."  [*Id*.].[7]  Section 1008 addressed when Solutia was required to provide an equal and ratable lien.  [*Id*.].  Section 1008 did not address any aspect of the release of an equal and ratable lien.  [PX 3, § 1008 at 44-45].[8]

The protection of the Negative Pledge was reinforced by other terms of the Indenture.  Section 1011 allowed JPMorgan to waive the benefit of Section 1008 (among other benefits), but only upon the consent of 66 2/3% of the Noteholders.  [*Id*., § 1011 at 48].  Under Section 102, in order to have the Indenture Trustee release a lien granted under Section 1008, Solutia was required to give the Trustee appropriate certifications and legal opinions that it had acted in compliance with the "conditions and covenants" of the

---

[6]   The full, unredacted text of Section 1008 can be found at pages 44-45 of Plaintiff's Exhibit 3.

[7]   Elsewhere in the Indenture, Solutia was required to determine "Consolidated Net Tangible Assets" in accordance with generally accepted accounting principles ("GAAP").  [PX 3 at 2].

[8]   The remaining language of Section 1008 set forth a list of categories of liens Solutia could grant to third parties without breaching the Negative Pledge.  [*Id*., § 1008 at 44-45].  None of these categories was at issue in the Adversary Proceeding.

Indenture.  [*Id*., § 102 at 6-7].  The Trustee also had the express right, under Section 603 of the Indenture, to investigate whether Solutia had in fact so complied.  [*Id*., §§ 102, 603].  Section 1009 prohibited Solutia from using "sale-leaseback" transactions, which have the financial effect of debt with a technically different structure, to circumvent Section 1008.  [*Id*., § 1009 at 46-47].  Section 1010 allowed Solutia to be excused from compliance with Sections 1008 and 1009 only if it deposited, or causes to be irrevocably deposited, cash with the Trustee sufficient to pay the Notes.  [*Id*., § 1010 at 47-48].

The financial result of the Negative Pledge and the other terms of the Indenture was to assure the Noteholders that the value of Protected Assets (except in a non-material amount) would be available to satisfy the obligations under the Notes in either of two ways:  *either* because there would be no lien upon the Protected Assets, and their value thus would be available to the Noteholders and Solutia's other unsecured creditors, *or* because Solutia would "effectively provid[e]" the Noteholders, through the Trustee, with a lien entitling them to share equally and ratably in the value of the Protected Assets.  [*Id*., § 1008 at 44-45].

### B.    Solutia's Worsening Financial Condition.

Solutia's financial condition deteriorated in the period leading up to July 2002 for a number of reasons.  [Adv. Docket Nos. 135 at 102:6-104:9; 119 at 15:17-16:12, 18:6-20].  Solutia's business entered a period of reduced profitability.  [Docket No. 23 at 4].  This was due to, among other things, higher world prices for inputs as well as reduced pricing power from world competition.  [*Id*. ("More recently, however, the [Debtors] financial difficulties have been compounded by a three-year economic downturn in the

-11-

chemical industry related to the slowing growth in certain world economies, persistently high raw material and energy costs, and significant overcapacity in the manufacturing sector."); *see also* Adv. Docket No. 105 at 23:4-13; Memorandum Decision at 5; Docket No. 3831 at 32-36].

Despite Solutia's attempt to deal with these problems, the impending pressure of potential catastrophic financial responsibility stemming from litigation over the Legacy Liabilities increased and was too much for Solutia to deal with. [Docket No. 3831 at 33-36]. When the extent of such responsibility became public on January 1, 2002, the value of Solutia's common stock began to drop precipitously. [*Id.* at 34-35]. Between December 31, 2001, and December 31, 2002, Solutia's stock went from a high of $14.02 per share to $3.63 per share. [*Id.* at 35].

### C.    Solutia's Grant of Liens in the Protected Assets in 2002.

In July 2002, Solutia acceded to its banks' demand for a lien on the Protected Assets to secure its bank loans. [PX 4; PX 73, ¶22]. The 2002 Amended Credit Agreement reduced the amount of the bank loans from $800 to $600 million. [PX 74]. In consideration of extending the maturity of the loans, Solutia granted a lien in the Protected Assets to the bank lenders to secure the entire loan. [*Id.*]. Under the Equal and Ratable clause, Solutia was therefore required to "effectively provide" an equal and ratable lien to the Trustee for the benefit of the Noteholders. [PX 3, § 1008 at 44-45].

Solutia purported to comply with this obligation by entering into a "Intercreditor and Collateral Trust Agreement," dated as of July 25, 2002 (the "Shared Lien Agreement"), among itself, its related additional borrowers and guarantors, Citibank N.A., as agent for the banks, and a collateral trustee, HSBC Bank USA ("HSBC"), named to hold a shared lien in the Protected

Assets. [PX 4]. Under the Shared Lien Agreement, HSBC acted as a "collateral trustee" holding the shared lien on behalf of **both** the bank lenders and the Noteholders. [*Id*.]. JPMorgan did not participate in the 2002 loan transaction. [*Id*.].

The Shared Lien Agreement granted distinct rights to the banks, on the one hand, and the Noteholders, on the other hand, with respect to the lien on the Protected Assets. [*Id*.]. Among other things, Solutia's banks, but not the Noteholders, received a senior lien in certain of the Protected Assets with a value up to 15% of Consolidated Net Tangible Assets. [*Id*., § 3]. Under the Shared Lien Agreement, the banks had better protection than the Noteholders respecting a future release of the shared lien. [*Id*.]. HSBC was required to obtain the consent of Citibank, as agent for the bank lenders, in order to release the shared lien under any circumstances. [PX 4]. However, pursuant to the Shared Lien Agreement**,** HSBC ostensibly could release the lien in favor of the Noteholders without complying with the Indentures requirements to provide JPMorgan with certificates and legal opinions, and an opportunity to investigate, as required under the Indenture. JPMorgan was given no right to notice of a release of its lien, nor an opportunity to give or withhold consent to the release, unless a "Triggering Event" had occurred. [*Id*., § 1(a) at 11-12]. This term was defined to mean that the Notes were in default or Solutia had taken actions in furtherance of bankruptcy. [*Id*.].

### D.    Solutia's Need for Further Financial Restructuring.

Solutia's financial condition worsened further following the closing of the July 2002 bank loans. [Docket No. 3831 at 34-38; Adv. Docket Nos. 113 at 15:22-17:8; 120 at 80:18-81:5; 135 at 115:13-23]. Long-pending tort litigation against Solutia, Pharmacia and Monsanto was heading for trial.

[Docket No. 3831 at 34-35]. At stake was liability of hundreds of millions of dollars for property damage from the release of PCBs into the environment in and around Anniston, Georgia. [*Id*.]. As those cases headed toward trial, it became increasingly likely Solutia could be held liable to plaintiffs' environmental tort claims in amounts far beyond its ability to pay. [Docket No. 23 at 5 (" . . . the Debtors' current business plan generates insufficient free cash flow to fund expected liquidity needs when the Legacy Liabilities are included: the Debtors' most recent financial models project that the [Debtors'] need for cash through 2006 will exceed its sources of cash by approximately $700 million."), 10-12 and 23-24].

At the same time, relatively poor returns in investment portfolios meant Solutia was faced with greater demand for contributions for retiree benefits. [*Id*. at 8 n.4]. Further, certain of Solutia's business ventures, such as its investment in a joint venture known as Astaris, became cash drains on the company. [*Id*. at 16-17; Docket No. 3831 at 34 (Solutia's Astaris joint venture "placed an additional drain on Solutia's operating cash flow.")].

On April 1, 2003, Solutia retained Rothschild, Inc. ("Rothschild"), a leading investment bank, to provide financial advice in the restructuring area, including the formulation and implementation of options for restructuring or reorganization as well as assistance with a bankruptcy filing. [PX 6]. Solutia also hired (a) bankruptcy counsel at Gibson Dunn & Crutcher LLP ("Gibson Dunn"), a national law firm [PX 8]; (b) financial advisors Kroll Zolfo Cooper, a well known consulting firm specializing in bankruptcy and reorganization [PX 10]; (c) Mercer Human Resource Consulting, to provide consulting services respecting officer and employee retention issues, including the Debtors' Key Employee Retention Program to be used to provide financial

incentives for executives to remain with the Debtors during bankruptcy [PX 13]; and (d) personal relations firm Sitrick & Company, Inc., to develop and implement the Debtors' bankruptcy communications plan [PX 121 at 56:23-57:13].

Solutia tasked Rothschild with coming up with a plan for a financial restructuring. [PX 6]. Solutia asked Rothschild to identify sources of liquidity to address its worsening financial condition. [*Id*.]. Solutia also sought advice from Rothschild respecting a strategy aimed at partially undoing the spin-off such that Monsanto would assume financial responsibility for a great portion of the Legacy Liabilities. [PX 69 at 1].

Beginning in the Spring of 2003, Rothschild made numerous presentations of their assessment of Solutia's restructuring prospects to Solutia's management and Board of Directors. [*See, e.g*., PX 63-PX 65; PX 67-PX 71; PX 152]. Rothschild's central, consistent observations, which were included in its presentations and/or testified to at trial, included the following: **First**, Rothschild advised that Solutia was using the Protected Assets inefficiently as a source of financing. [Adv. Docket Nos. 116 at 142:13-143:13; 118 at 73:23-75:19, 80:5-81:17]. In particular, the equal and ratable lien obligation constrained Solutia's ability to obtain vital liquidity because of the equal and ratable clause. [PX 67 at 8 ("The pro rata liens on . . . debt can potentially be released through the proposed asset based facility.")]. **Second**, Rothschild posited that Monsanto could agree to take financial responsibility for a settlement where it would "take back" a substantial portion of the Legacy Liabilities. [Adv. Docket No. 118 at 124:21-126:11, 133:19-135:6]. **Third**, Rothschild advised that the Notes should be exchanged into equity. [PX 68 at 15 ("[A]t a minimum,

-15-

$450 million . . . of debt may be equitized through in-court process")].  The conversion of Notes into equity concession would increase the value of the equity to be given to Monsanto, and better position Solutia to perform the portion of the Legacy Liabilities it would retain in the settlement with Solutia. [Adv. Docket Nos. 112 at 76:11-77:20, 110:16-111:19; 118 at 56:15-58:17]. **Fourth**, Rothschild advised that Noteholders would have little incentive to make this concession while the Notes were secured by the equal and ratable lien.  [PX 28; *see also* Adv. Docket No. 120 at 84:14-85:11 (confirming Solutia's strategy was designed to create a "negotiating dynamic[]" where Noteholders would be more likely to make concessions.)].[9]  Over time, the various elements of Rothschild's advice emerged as a "deleveraging strategy" for Solutia.

>     **E.    Solutia's Decision to Release the Noteholders' Lien as Part of Its Deleveraging Strategy.**

Based on their observations, Rothschild advocated for the implementation of a two-step refinancing of Solutia's bank debt as part of the deleveraging strategy.  [PX 64 at 25 (Financing broken into three sections: (1) "Pre-Petition [which includes need to] negotiate terms and conditions of Term Loan [and] [s]tructure flexibility to transform into DIP Term Loan." (2) "Lien Release [which means] [i]f existing Credit Agreement and Astaris Makewhole are refinanced as described above, the liens on the 2027, 2037 and 2005 notes are released."  (3) "Post-petition [which includes] [r]oll[ing]

---

[9]   In the April 2003 presentation materials to its client, Rothschild identified the institutions constituting the principal Noteholders.  [PX 70; Adv. Docket No. 156 at 44:1-48:18].   Nonetheless, Solutia's strategy, as ultimately evidenced by Rothschild's September 15, 2003, presentation materials, [PX 152], was to delay contact with the Noteholders for six (6) months following identification – at a time when their liens had been stripped.

[the] existing pre-petition Working Capital Revolver into DIP Revolver.")].
Under the two-step refinancing, the Noteholders' lien would be released in
contemplation of granting a senior lien on the Protected Assets while leaving
the Notes unsecured.  [PX 69 at 23 ("The pro-rata liens . . . may be released
through the proposed asset based facility.  This would facilitate addressing
S[olutia's] leverage issues during a Chapter 11 process as this debt will then
be fully unsecured.")].  In step one, Solutia would exploit its power under the
Shared Lien Agreement to release the Noteholders' lien without JPMorgan's
consent and without informing JPMorgan or Noteholders in advance.  [PX 64
at 28 ("Pursuant to Section 7.01(ii) of the Intercreditor and Collateral Trust
Agreement . . . upon the date that the Existing Credit Agreement and the
Astaris Makewhole are paid in full, the liens will be released.")].  In step two,
Solutia would grant a senior lien to a third party lender, while leaving the
Notes unsecured.  [PX 64 at 29 ("Upon the occurrence of a filing of
bankruptcy, if necessary, the Term Loan will advance DIP financing on the
terms of the pre-petition Term Loan for an additional amount up to
$250 million.")].

Solutia's bankruptcy attorneys at Gibson Dunn were tasked to develop
the legal steps required to implement the two-step financing and the
deleveraging strategy, including preparing Solutia for a bankruptcy filing.
[PX 8].  Beginning in July, 2003, Solutia established a high-level team of
executives, outside lawyers (including bankruptcy counsel) and Rothschild
bankers to prepare for bankruptcy.  [PX 94].  The group, which was
designated the "Restructuring Council," was headed by Mr. Jeffrey Quinn –
the newly-appointed Chief Restructuring Officer [Adv. Docket Nos. 106
at 55:1-8; 119 at 38:13-40:11; PX 94], who has been Chief Executive Officer

of Solutia since shortly after the Debtors filed the Bankruptcy Cases. [Docket No. 3831 at 42-43]. The planning also included extensive dialogue among the Restructuring Council over the legal basis to overcome the financial effect of the Equal and Ratable clause. [PX 35 (confirming discussion with counsel to banks and communication of how "the 'step' ABL is crucial to 'desecuritize' the bond debt . . .")].[10]

By August, 2003, the Restructuring Council and Solutia's professionals reached a consensus as to the means by which the Noteholders' lien would be released. [PX 65 at 37 ("The pro-rata liens on approximately $680 million of debt may be released through the proposed asset based facility. This would facilitate addressing S[olutia]'s leverage issues during a Chapter 11 process as this debt will then be fully unsecured. Looking at a preliminary debt capacity and competitive analyses, Chapter 11 would allow S[olutia] to 'Rightsize' its capital structure through the equitization of a significant portion of unsecured debt.")]. Solutia would use the term of the Shared Lien Agreement which ostensibly allowed it to direct HSBC to release the Noteholders' lien without the consent of the Trustee. [PX 78]. The first step loan transaction would be negotiated to establish a maximum level of debt to be secured by the Protected Assets just below the level of 15% of Consolidated Net Tangible Assets. [DX 6, at Security Agreement; PX 76, § 5.01(d)(iii)]. On the strength of this limitation, Solutia would arrange for HSBC to release the shared Noteholders' lien while simultaneously granting a lien on all or some of the Protected Assets to secure the step one financing. [PX 35]. Meanwhile, Solutia would have made arrangements to obtain a much larger loan in

---

[10]    Mr. Snyder responded to this e-mail correspondence from Mr. Oscar Garza at Gibson Dunn, confirming that it was "[v]ery Helpful [sic]." [PX 188].

bankruptcy as a "debtor in possession" under Chapter 11. [Adv. Docket Nos. 120 at 95:1-23, 131:22-132:15; 111 at 35:19-35:4; 118 at 109:23-110:5; PX 26; PX 31; PX 32; PX 152]. The entire amount of this loan would be secured by all or most of the Protected Assets. [*Id.*]. However, Solutia would take the legal position that its intervening bankruptcy filing relieved it of an obligations to grant a lien to Noteholders under the Equal and Ratable clause, even though the level of third-party debt to be secured by the Protected Assets far exceeded the materiality threshold of the third clause of Section 1008 of the Indenture. [Adv. Docket No. 111 at 42:1-8; PX 182 at 75-79 ("THE COURT: Since we have given a lien in everything to the banks now, it would seem to me that they [the Trustee's Liens] would spring back. DEBTORS' COUNSEL: If we weren't in Bankruptcy.")].

At trial, it was uncontroverted that Solutia could not continue as a going concern if it had to keep the level of third-party debt secured by the Protected Assets below the materiality threshold of the third clause. [Adv. Docket Nos. 163 at 7:12-9:2; 105 at 42:22-43:2; 118 at 6:2-10:25, 12:18-13:5; 111 at 19:8-20:4, 21:8-13]. Accordingly, and at all relevant times, from the beginning of the development of the two-step strategy, the reduction in the third-party debt secured by the Protected Assets to a level below the materiality threshold was to be in contemplation of a second-step borrowing at a level far exceeding the threshold. [Adv. Docket No. 111 at 34:19-35:4].

### F.    The Anniston Litigation Settlement.

In late August, 2003, Solutia, Monsanto and Pharmacia announced a settlement with the plaintiffs in the Anniston litigation. [DX 19 Group]. The companies contributed hundreds of millions of dollars for the victims of PCB contamination arising from Old Monsanto's operations in the area. [*Id.*].

-19-

The Anniston settlement did not resolve Solutia's financial problems. [Docket No. 3831 at 33 (confirming that the Legacy Liabilities "required average payments by Solutia in excess of $100 million per year," a figure that was projected to increase significantly in future years); Adv. Docket No. 119 at 10:25-11:5]. Mr. Quinn acknowledged the continuing financial strain such obligations were putting on Solutia in an e-mail to Jeff Kindler, General Counsel to Pfizer (parent company to Pharmacia) less than two (2) weeks after the settlement was announced, indicating that:

> [s]ince our 10-Q was filed in mid-August, we have lost over $40 million in liquidity from trade creditors. Our current projections show liquidity reaching dangerously low levels in mid-September. There are a number of self help options we are currently exploring, but we are facing the very real threat of a liquidity-driven-bankruptcy before having time to pursue these options.

[PX 137 at 1]. Legal proceedings over the Legacy Environmental Liabilities were unresolved, including the cost of clean up efforts at Anniston. [Docket No. 3831 at 30]. Solutia continued to face unresolved Legacy Retirement Liabilities associated with the massive underfunding of its pension plan and was still dealing with the overhang of the settlement of other Legacy Retirement Liabilities. [*Id*. at 29-30].[11] Following the Anniston settlement,

---

[11] The 1997 spin-off also left Solutia bearing the responsibility for all (a) medical and life insurance benefits due employees that retired from Old Monsanto prior to the spin-off; and (b) disability benefits due employees that became disabled while working for Old Monsanto prior to the spin-off. [Docket No. 3831 at 29]. Such liabilities were a substantial cash drain on Solutia post spin-off, aggregating approximately $55 to $60 million per year. [*Id*.]. In an attempt to define the extent of its future obligations to a universe of approximately 20,000 beneficiaries, in June 1998, Solutia brought a declaratory judgment action in Florida state court. [*Id*.]. Thereafter, three (3) separate actions filed by retirees in United States District Court were consolidated for all purposes with such action. [*Id*.]. A settlement was reached prior to trial, and on November 1, 2001, the District Court for the Northern District of Florida approved that

Solutia continued to prepare to implement its restructuring strategy, including the two-step release of the Noteholders' lien in contemplation of later borrowing secured by a senior material lien.  [PX 26].

### G.    The Refusal of Mainstream Lenders to Participate in the Release of the Noteholders' Lien.

In 2003, Solutia approached potential lenders to explore participation in the two-step refinancing.  [Adv. Docket No. 111 at 44:21-45:14].  Solutia approached Citibank, its existing bank agent, and the banking arm of JPMorgan, but was rebuffed in both instances once the objective of the two-step transaction was understood.  [PX 40 ("Both BofA and JPM in independent calls have expressed continued interest in participation in any DIP if the company is not also requiring participation in the DIP to include participation in a process to remove collateral from notes and debentures.")].  Both Citibank and JPMorgan refused to participate in the two-step transaction because of the harmful effect on Noteholders of the release of the equal and ratable lien in contemplation of granting a senior lien in the Protected Assets to secure bankruptcy loans.  [PX 182 at 40-41 (confirming that Citibank and other bank lenders refused to participate because of "concerns about franchise issues, the result of that on bonds and so forth."); *see also*, Adv. Docket Nos. 26 at 4, 105 at 40:16-42:21; 111 at 44:21-46:1; 108 at 25:17-28:6, 54:10-58:14].

Solutia did, however, find a willing partner to the proposed two-step transaction in Ableco Finance Company ("Ableco").  Solutia and Ableco entered into intensive efforts to conclude the two-step financing in the fall

---

settlement, determining the full extent of Solutia's ongoing obligations with respect to such payments.  [*Id.*].

of 2003. [PX 158; PX 103]. Representatives of Solutia and Ableco communicated frequently and openly about the propriety and legality of the plan to release the equal and ratable lien in contemplation of granting a senior lien to Ableco. [PX 103 at 3 ("The Stage 1 financing will be used to (i) refinance the Company's existing indebtedness, (ii) for general corporate purposes and, (iii) remove the pro-rata liens on the PP&E. . . . It is contemplated that for Stage 2, Ableco's Stage 1 facility will be rolled into a debtor-in-possession ("DIP") financing and increased by $150,000,000, to $500,00,000 in the event that the Company files for bankruptcy protection.")]. Careful not to do anything to subject Ableco's fees to undue scrutiny when stage two was before the Bankruptcy Court for approval, on September 28, 2003, Ableco's counsel warned:

> REMEMBER STAGE II WILL BE IN BANKRUPTCY AND THE FEES WILL BE SUBJECT TO OBJECTIONS FROM OTHER PARTIES AND BANKRUPTCY COURT APPROVAL.

[PX 48 at 2 (capitalization in original)].

### H. The Structuring of the Ableco Loans.

By early fall, 2003, Solutia and Ableco had fully developed the details of the two stage transaction. [PX 103; PX 155]. Ableco had committed to lend up to $350 million in the first stage transaction. [PX 155]. The loan would require that the maximum amount of the debt secured by any of the Protected Assets would be $1,000 less than the amount of the material lien, as determined by Solutia. [DX 6, at Security Agreement; PX 76, § 5.01(d)(iii); Adv. Docket No. 118 at 80:5-81:17].[12] Solutia and Ableco also resolved the

_____

[12]  On August 13, 2003, Ableco's counsel also confirmed that the draft financing agreement was prepared so as to grant liens to Ableco "to the maximum extent that

details of the second step financing. [PX 155]. Solutia agreed to provide a senior lien in the Protected Assets to Ableco for the full amount of loans of up to $500 million. [*Id*.]. As a condition to the second step financing, Ableco required that there be no equal and ratable lien, or even a junior lien, in favor of Noteholders. [PX 155; PX 58 (Ableco's counsel indicated on August 13, 2003, that the draft financing agreement ". . . required that . . . (ii) the liens that have been granted prior to the date hereof pursuant to the equal and ratable clause in the Indentures be released.")]. Ableco would receive fees and expenses in the aggregate of approximately $25 million, fully earned and payable on the closing of the first step of the transaction. [Adv. Docket No. 105 at 39:18-23].[13]

As structured, the first step of the Ableco loan provided insufficient liquidity to sustain Solutia as a going concern. [PX 73, ¶55; PX 121 at 177:24-179:12 (Mr. Quinn acknowledged at his deposition on December 1, 2005, that the first stage of the desecuritization transaction left a "funding gap" of more than $100 million)]. Solutia would need more liquidity in the near future. [PX 30 at 1 (Rothschild confirming on July 2, 2003, that ". . . we have communicated an overall financing requirement between the Revolver and Term B of approximately $500mm.");

---

such entities are permitted to grant liens under the Indentures without triggering the equal and ratable clause . . ." [PX 58]. Because the desecuritization transaction would take the Equal and Ratable Clause out of play, Solutia's chief financing lawyer called the transaction and "A/B loan/bond desecuritzation plan," [PX 33], and Solutia's bankruptcy counsel referred to the first stage of the transaction as the "ABL/'desecuritizing' financing." [PX 34].

[13] Interestingly, Rothschild's April 1, 2003 Retention Agreement [PX 6] was amended on October 1, 2003 (only days before the October 8, 2003, closing of the Ableco transaction) to ensure that Solutia did not have to pay a "New Capital Fee" to Rothschild "equal to (i) 1.0% of the face amount of any senior secured debt" with respect to both stages of the contemplated two-step transaction with Ableco. [PX 7].

PX 123 at 113:12-114:1 (Rothschild confirming that "[t]he contemplated structure of the financing was a two-step or a two-stage financing where 350 million or thereabouts would be borrowed to refinance the existing senior facility and probably provide some additional liquidity.  And in a second step or second stage . . . the company would be able under certain circumstances to borrow an additional $150 million to support a desirable restructuring. Giving rise to that $500 million number.")].  Despite Solutia's needs, its available liquidity was actually reduced upon the closing of the Ableco loan. [PX 73, ¶55; PX 121 at 177:24-179:12]. [14]

### I.    The Release of the Noteholders' Lien on the Protected Assets.

Chief Restructuring Officer Quinn immediately pressed his restructuring group to finalize the documentation of the step two transaction. Solutia and Ableco finalized a term sheet for the transaction in September 2003.  [PX 155].  The term sheet required that the loan be secured in its full amount by senior lien on the Protected Assets.  [*Id.*].  Solutia and Ableco closed the step one financing transaction on October 8, 2003.  [PX 76; DX 21 Group].

The legal documentation used to cause the release of the Noteholders' lien was complex.  [PX 4].  The documentation did not purport to provide for the release of the Noteholders' lien according to the requirements of informed Trustee consent under the Indenture.  [PX 3].  Instead, the documentation relied upon the ostensible authority to release the lien contained in the Shared Lien Agreement of the prior year, to which the Trustee was not a party.

---

[14]    It is also worthy to note that immediately prior to October 8, 2003, Solutia still had substantial availability under its existing 2002 credit facility, as it had only drawn down approximately $250 million of the $300 million available to it.  [PX 65 at 1; Adv. Docket No. 135 at 86:3-90:16].

[PX 4].  Solutia would cause the lien to be released by a direction to HSBC by
Citibank, the agent for the bank lenders, based on the position that no
"Triggering Event" had occurred.  [*Id*., § 7.02(a)].[15]  Solutia needed to
provide Citibank with an officer's certificate so stating in order that
Section 7.02(a) of the Shared Lien Agreement appeared to provide due
authority for Citibank, as agent for the bank lender, to direct HSBC to release
the shared lien it held for the benefit of bank lenders and Noteholders
combined.  [PX 73 at ¶58; PX 4, § 7.02(a); PX 78].[16]

Solutia's lawyers struggled with the comfort materials for Citibank.
Section 7.02(a) of the Shared Lien Agreement ostensibly authorized Citibank
alone to release the lien only if no "Triggering Event" had occurred.  [PX 4,
§ 7.02].  This was defined to include "the taking of corporate action in
furtherance of any [bankruptcy filing]."  [PX 3; PX 4].  Solutia had been
actively preparing for bankruptcy for many months.  [PX 6; PX 8; PX 94].  It
was closing the first step transaction – and reducing its access to liquidity – in
contemplation of the second-step borrowing in a bankruptcy case.  Solutia

---

[15]    Section 7.02(a) of the Shared Lien Agreement states in relevant part:

> At any time during which, to the actual knowledge of any Responsible Officer of
> the Collateral Trustee, no Triggering Event has occurred and is continuing, the
> Lien of the Sharing Security Documents may, at any time, be released in whole or
> in part by the Collateral Trustee pursuant to written directions signed by the
> Collateral Agent, <u>provided</u> that no such release shall be effected in such a manner
> so that fewer than all, but not all, of the Sharing Secured Parties continue to be
> entitled to the benefits of such Lien (or become entitled to the benefits of a
> substitute Lien) without each of the Sharing Secured Parties hereunder being
> equally and ratably secured on the respective property subject to such Lien (to the
> extent such property is Shared Property).  No such release shall require any
> consent or approval by any other Sharing Secured Party.

[PX 4, § 7.02 (emphasis in original)].

[16]    The Shared Lien Agreement also provided for HSBC to release the lien if the entire
amount of bank debt had been paid off.  [PX 4, § 7.01].  Solutia did not rely on this
term.

took action to form a New York subsidiary corporation to establish venue in the New York bankruptcy courts. [Adv. Docket No. 156 at 24:5-25:22; PX 189]. Ableco required that a New York affiliate be among the borrowers under the bankruptcy loan facility. [*Id*.]. Ultimately, Gibson Dunn presented a lengthy and heavily caveated legal opinion concluding Trustee consent was not necessary and providing a review of scant legal authorities and opinions that a court "would" hold that the Trustee's consent was not required. [PX 77]. On the strength of the Gibson Dunn opinion, Citibank directed HSBC to release the shared lien. [PX 73 at ¶58; PX 78]. The Trustee was not advised of the release of the lien until more than four (4) weeks after the event. [PX 10].

## J.    Solutia's Implementation of Its Deleveraging Strategy Following Release of the Noteholders' Lien.

### 1.    Solutia Organizes a Noteholder Group After Release of the Noteholders' Lien and Clears the Remaining Obstacles to Filing for Bankruptcy Protection.

On October 22, 2003, Solutia announced that its bankruptcy counsel initiated contact with colleagues at the law firm Akin Gump Strauss Hauer and Feld LLP ("Akin Gump") and made them aware of Solutia's desire to assemble a group of Noteholders for the purpose of negotiating a financial restructuring. [Docket No. 3831 at 38]. As detailed in the Rothschild presentation materials, the restructuring would be aimed at offering Noteholders equity in satisfaction of all or substantially all of the Notes in connection with an agreement with Monsanto to "take back" a substantial portion of Legacy Liabilities. [PX 152 at 5 ("Key Action Items" include the "[f]ormulat[ion] and negotiate[ion of a] recapitalization proposal with key creditors.")]. Akin Gump formed a group of Noteholders, which in turn hired

-26-

financial advisors at Houlihan Lokey Howard & Zukin ("Houlihan"), an experienced financial advisory firm in the restructuring area. [DX 114]. After a brief due diligence effort, the Noteholders' professionals, at Solutia's behest, approached Monsanto to initiate negotiations. [Adv. Docket No. 121 at 24:25-26:8, 27:8-28:20]. They were rebuffed, and Monsanto declined to meet to discuss "taking back" Legacy Liabilities. [Adv. Docket No. 121 at 40:13-41:25; PX 121 at 353-54].

Certain of Solutia's European Affiliates had outstanding public debt obligations at the time. [Docket No. 3831 at 84]. These obligations, by their terms, would have been placed in default upon a bankruptcy filing by Solutia in the United States. [PX 91 at 3; Docket No. 23 at 22]. Solutia was unwilling to face the possibility that its European entities could be in default, and possibly placed into European insolvency proceedings, by reason of the anticipated Chapter 11 filings by the domestic corporations. [PX 91 at 3; Docket No. 3831 at 35, 38 and 84]. Accordingly, Solutia sought and obtained a modification of the terms of the European debt obligations eliminating the cross default. [Docket No. 23 at 22; Docket No. 3831 at 38]. The modification was finalized on December 16, 2003. [Docket No. 23 at 22; PX 92 at 2-3]. The Debtors filed for relief under Chapter 11 on the following day. [Docket No. 3831 at 39; Memorandum Decision at 3].

### 2.    Solutia's Bankruptcy Loans.

With its bankruptcy petition, Solutia filed a motion to approve step two of the Ableco transaction. [PX 180]. Solutia sought to borrow up to $515 million ($500 million on term and revolving credit bases, plus $15 million for professional expenses, including for Akin Gump and Houlihan.) [*Id.* at 9-10]. As contemplated, the loans were to be secured by,

among other collateral, a senior lien in the Protected Assets. [*Id*.]. With its motion, Solutia provided an affidavit of Mr. Quinn stating that the secured borrowings in bankruptcy were essential to its financial survival. [Docket No. 23 at 68 ("The Debtors urgently need bank credit to purchase raw materials and inventory, pay their employees, maintain their manufacturing and distribution systems and otherwise continue their businesses and operations. Absent immediate availability of new credit, the Debtors' operations will be severely disrupted and they will be forced to cease or sharply curtail operations of some or all of their businesses, which in turn will limit or eliminate the Debtors' ability to generate operating revenue.")]. Mr. Quinn further averred that Solutia would have insufficient liquidity to continue as a going concern without being able to borrow under the step two transaction:

> In sum, without immediate access to postpetition financing, the Debtors face a liquidity crisis that would threaten the viability of their businesses. If cash is not available to maintain 'business as usual' operations during the post-filing period, the Debtors face a substantial and devastating loss of revenue and other irreparable harm from severe tightening or elimination of trade credit, cancellation of sales orders, delayed deliveries, loss of employees and employee morale and deteriorating relationships with suppliers – all of which will adversely affect the value of the Debtors' businesses. **The ability of the Debtors to remain viable operating entities and reorganize under chapter 11 of the Bankruptcy Code thus depends upon obtaining the interim and final relief [approving financing] requested in this Motion.**

[*Id*. at 69 (emphasis added)].

 Prior to the final hearing on its financing motion, Solutia received expressions of interests from other lenders to enter into the proposed DIP

financing.  [Adv. Docket No. 116 at 76:2-18].  Citibank, as agent for a new group of lenders, made a competing proposal to Solutia.  [*Id*.].  That competing proposal provided higher borrowing levels than the proposed Ableco DIP financing, and was on terms more favorable to Solutia in other respects.  [*Id*.; *see also* Docket No. 278].  As with the proposed Ableco DIP financing, the Citibank proposal required that its loans be secured by a senior lien in the Protected Assets.  [Docket No. 278].

### 3.    The Indenture Trustee's Reservation of Rights.

The Trustee appeared in the bankruptcy case and objected that the Bankruptcy Court should not make a final adjudication that the Protected Assets were free and clear of any lien in favor of Noteholders.  [Docket No. 171].  At the final hearing, the Bankruptcy Court commented upon the two-step Ableco transaction as follows in response to the Debtors protestation that their conduct was permissible:

> I don't agree, but on the other hand, it would be kind of clever to have done it. It certainly would leave somebody sitting out in the cold.

[PX 182 at 75-79].

The Order approving the Citibank DIP loan contained an express reservation of the Trustee's right to assert that the Protected Assets should be made subject to an equal and ratable lien in favor of Noteholders under the Indenture.  [Docket No. 278].

### 4.    Solutia's Implementation of the Deleveraging Strategy in Bankruptcy.

During its bankruptcy case, Solutia has implemented the elements of its deleveraging strategy:  obtaining liquidity via its bankruptcy loans, secured by a senior lien; pursuing a settlement where Monsanto would "take back" a

substantial portion of Legacy Liabilities in return for a large equity sake; and converting unsecured debt (including debt under the Notes) into equity. [PX 65 at 37]. In June 2005, Solutia announced an "Agreement in Principle" with the Creditors Committee and Monsanto on the terms of a restructuring plan to be submitted for Bankruptcy Court approval. [Docket No. 3831 at 86-87]. The agreement, which was later incorporated into a proposed Joint Plan of Reorganization, dated February 14, 2006 [Docket No. 2855], provided for Monsanto to assume a substantial portion of the Legacy Liabilities in return for 26.5% of Solutia's equity. [*Id*.]. (Monsanto could also acquire up to an additional 22.7% of equity in return for funding certain Legacy Retiree Liabilities.) [*Id*.]. The claims of all unsecured creditors together, estimated at $900 million, including $450 million of claims under the Notes, would be exchanged for approximately 51.1% of Solutia's equity. [*Id*.].

In May 2005, the Trustee commenced the Adversary Proceeding. [Adv. Docket No. 1; PX 72]. The Trustee sought declaratory relief that the Bankruptcy Court find that the Notes were secured by an equal and ratable lien under the Indenture notwithstanding Solutia's actions to release the lien in October, 2003. [*Id*.]. The Complaint also sought "adequate protection" of the Noteholders' lien under Section 363 of the Bankruptcy Code. [*Id*.].

In February 2006, Solutia formally proposed a plan of reorganization embodying the material terms announced in 2005. [Docket No. 2855]. The 2006 proposed restructuring plan – and a subsequent proposed plan filed in May, 2007 – embody the essential terms of Solutia's deleveraging strategy. [Docket Nos. 2855 and 3830].

## V.    SUMMARY OF ARGUMENT

The Judgment should be reversed because the Bankruptcy Court made not less than three decisive errors of law.[17]

- The Bankruptcy Court erred as a matter of law in construing the Indenture. The Court ruled that the "plain and clear" meaning of the Indenture was that an equal and ratable lien would be released automatically, without action by Solutia or any other party. The Indenture did not provide for this, nor did it contain any other language expressly authorizing Solutia to release the Noteholders' lien without the Trustee's informed consent, whether as part of its deleveraging strategy, or otherwise.

- The Bankruptcy Court erred as a matter of law in declining to review whether Solutia breached the covenant of good faith and fair dealing, implied in every contract under New York law. Applicable legal standards required the Bankruptcy Court to evaluate whether Solutia's conduct breached the covenant of good faith and fair dealing, whether or not its actions were permitted under the language of the Indenture. The Bankruptcy Court erred by declining to perform this evaluation on the mere basis that the release of the lien was "not prohibited" under the Indenture, and because of its erroneous construction that the lien release occurred automatically under the Indenture.

- The Bankruptcy Court erred as a matter of law in declining to evaluate Solutia's conduct under the applicable legal

---

[17]    The Noteholders' Committee concurs with, and incorporates by this reference, the grounds for reversal and/or remand set forth by the Trustee in the Trustee Opening Brief.

-31-

standards governing the covenant of good faith and fair dealing. Controlling New York law required the Bankruptcy Court to determine whether the release deprived the Noteholders of their bargained-for benefits under the Indenture and was contrary to their reasonable expectations, or was merely the exercise of explicit contractual rights in a manner having an "incidental effect" on the Noteholders' interests. Because of the Bankruptcy Court's errors, this Court should reverse the Judgment.

## VI.    ARGUMENT

The Bankruptcy Court committed an error of law in interpreting Section 1008 of the Indenture as having a "plain and clear" meaning that the Noteholders' lien was automatically released. Contrary to the Bankruptcy Court's erroneous construction, the Indenture does not provide for an equal and ratable lien to be "lost . . . effortlessly when [third party] secured borrowing falls below the [materiality] threshold." [Memorandum Decision at 21]. The Indenture required Solutia to "effectively provide" the equal and ratable lien, and contained no terms authorizing release of a lien other than upon the informed consent of the Trustee. [PX 3, § 102 at 6-7].

The Bankruptcy Court erred again when it concluded that the release was not subject to review under the covenant of good faith and fair dealing implied in every contract governed by New York law. [*Id*. at 22-27]. Using an erroneous standard of law, the Bankruptcy Court declined to analyze Solutia's conduct under the covenant on the mere basis that the release was "not prohibited" under the Indenture, and because the Indenture's "plain and clear meaning" provided for an automatic release of the Noteholders' lien. [*Id*. at 27]. It is well-established under controlling precedents that a party's

-32-

conduct may be found to breach the implied covenant even if the conduct is "not prohibited" by a contract. Rather obviously, the implied covenant would have no meaning or purpose if it only applied conduct prohibited under other terms of a contract.

By declining to apply the covenant of good faith and fair dealing to the evidence, the Bankruptcy Court failed to analyze Solutia's conduct under the applicable legal standards. Under controlling law, the Bankruptcy Court was required to evaluate whether Solutia's conduct deprived the Noteholders of the "bargained-for fruits" of the Indenture, and was beyond their reasonable expectations. The Bankruptcy Court did not do this. Nor did the Bankruptcy Court analyze Solutia's conduct to determine whether Solutia's release of the lien as part of its deleveraging strategy was merely a "self-interested act" within its contractual rights with only the "incidental result" of doing harm to the Noteholders.

The uncontroverted facts adduced at trial established a breach of the covenant under the appropriate legal standards. Solutia's objective at all relevant times was to achieve a financial restructuring by its deleveraging strategy. It planned to grant a material senior lien in the Protected Assets to a third party lender while the Notes remained unsecured. It planned to use the release to put leverage on Noteholders to exchange the Notes for equity in the deleveraging. In so doing, Solutia acted deliberately to deprive the Noteholders of the protection of the Equal and Ratable clause. The Bankruptcy Court, by its errors of law, closed its eyes to the compelling and uncontrovertible finding that Solutia breached the implied covenant of good faith and fair dealing.

A.    **The Bankruptcy Court Erred in the Interpretation of the Indenture.**

The Bankruptcy Court's interpretation of Section 1008 of the Indenture was erroneous as a matter of law.  Interpretation of the provisions of a written contract is a matter of law and, on appeal, is subject to *de novo* review. *Bellefonte Reinsurance Co. v. Aetna Casualty and Surety Co.*, 903 F.2d 910, 912 (2d Cir. 1990) ("The proper standard for appellate review of a pure textual construction by the district court, whatever the procedural posture of the case, is *de novo*.").

The "negative pledge" of the Indenture was just that:  a promise not to do something unless an exception to the promise applied.  The starting point of the promise is stated clearly in the first clause of Section 1008:

> **[Solutia] will not . . . create, incur, issue, assume, guarantee or secure any notes, bonds, debentures or similar evidences of indebtedness for money borrowed . . . [defined as "Debt"], secured by any pledge of, or mortgage, lien, encumbrance or security interest on . . . , any Principal Property owned or leased . . . or on any shares of stock or Debt of any Restricted Subsidiary . . . ,**

interest on . . . , any Principal Property owned or leased . . . or on any shares of stock or Debt of any Restricted Subsidiary . . . ,

> **without effectively providing that the [Notes] . . . shall be secured equally and ratably with (or prior to) such secured Debt . . . , so long as such secured Debt shall be so secured,**

> **unless, after giving effect thereto, the aggregate principal amount of all such secured Debt then outstanding plus Attributable Debt of the Company and its Restricted Subsidiaries in respect of sale and leaseback transactions . . . would not exceed an amount equal to 15% of Consolidated Net Tangible Assets . . .**

-34-

[PX 3 § 1008 at 44-45 (emphasis added)].  Negative pledge clauses have a widely-recognized and accepted purpose that is naturally evident in the text:

> The objective of a negative pledge clause, particularly one in comprehensive form, is to make as certain as practicable that no other creditors have a right to sell the obligor's property or take possession of such property to enforce a prior lien or other prior encumbrance, and that in the event of bankruptcy, the amount of secured debt, if any, will not be such as to deprive the unsecured debenture holders of full participation in the liquidation or reorganization.

American Bar Foundation, Corporate Debt Financing Project, *Commentaries on Model Debenture Indenture Provisions*, § 10-10 at 350 (1971); *see also* Matthew H. Hurlock, *New Approaches to Economic Development:  The World Bank, the EBRD, and the Negative Pledge Clause*, 35 Harv. Int'l L.J. 345, 347 (1994) ("Negative pledge clauses appear in loan agreements in lieu of a grant of security, providing comfort to the unsecured lender that 'the commercial decision it has reached to lend money to a borrower with certain current and projected assets will not be materially changed by the borrower granting rights to those assets to other creditors.'  By executing a negative pledge clause, the borrower promises that it will not encumber its property, either in the present or future, to secure the loan of a subsequent creditor that would give such subsequent creditor priority over the unsecured lender."); Carl S. Bjerre, *Secured Transactions Inside Out: Negative Pledge Covenants, Property and Perfection*, 84 Cornell L. Rev. 305, 311 (1999) (internal footnotes omitted) (a negative pledge is "intended as protection against later secured borrowings"); Felicia Smith, *Securities Symposium Issue: Applicability of the Securities Act of 1933 and the Trust Indenture Act of 1939 to Consent Solicitations to Amend Trust Indentures*, 35 How. L.J. 343, 365

(1992) ("the purpose of the negative pledge clause is to ensure that there will not be claims on the company's or subsidiaries' assets that are superior to those of the holders").

The Bankruptcy Court's interpretation of the third clause of the Negative Pledge as "plainly and clearly" providing for an automatic release of the Noteholders' lien was error based simply on the structure and syntax of the sentence. The second "Equal and Ratable" clause of the Indenture relaxed the promise of the first clause by allowing Solutia to grant a lien on the Protected Assets to a third party, but only in a way which assured that lien would not be senior. The third clause of the Negative Pledge described an exception to the obligation undertaken by Solutia in the first two clauses. The third clause begins with the word "unless" and follows immediately from the preceding clauses in a single sentence. It carries only one interpretation. It is an exception to the obligations undertaken by Solutia in the preceding two clauses, and says nothing about when a lien may be released after it has been granted under the Equal and Ratable clause.

The Bankruptcy Court ignored this and invented something else (as its first and most serious error of law):

> The Indenture was drafted to take a look at a single benchmark. It states that when over 15 percent of the CNTA are liened, the Equal and Ratable Lien is automatically in place. It follows, therefore that when less than 15 percent of the CNTA are liened there is no right to an Equal and Ratable Lien. ***What goes on without any effort on the part of the Indenture Trustee is lost just as effortlessly when secured borrowing falls below the 15 percent threshold.***

[Memorandum Decision at 21 (emphasis added)]. To the Bankruptcy Court, Section 1008 provided a self-executing mechanism whereby liens would be

extinguished automatically according to the relative levels of third party debt and Consolidated Net Tangible Assets. No act on Solutia's part would be necessary, since the creation and extinguishment of the liens would happen automatically.

The Bankruptcy Court's error is manifest. Section 1008 involved a promise to effectively provide (i.e., to grant) an equal and ratable lien. Solutia took actions to do so, such as granting mortgages on the real estate among the Principal Property in favor of HSBC. [DX 6]. It created an express trust in favor of HSBC to hold the liens on the Protected Assets. [*Id.*]. Just as it acted to create the lien, Solutia acted to release it. It caused its bank lenders to direct HSBC to release the lien. Its counsel provided a lengthy legal opinion to cause this to happen.

From every standpoint, the Bankruptcy Court's "automatic release" interpretation was simply wrong. The Bankruptcy Court offered no alternative construction on which to base its ruling. For this reason alone, the Judgment must be reversed.

> **B.    The Bankruptcy Court Erred by Failing to Determine Whether Solutia's Conduct Breached the Covenant of Good Faith and Fair Dealing.**
>
> > **1.    The Applicable Legal Standards Under the Covenant of Good Faith and Fair Dealing.**

Under New York law, in every contract there is an implied covenant of good faith and fair dealing "which precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir. 1980); *Dweck Law Firm, L L.P. v. Mann*, 340 F.Supp.2d 353, 357-58 (S.D.N.Y. 2004) ("persons invoking the aid of contracts are under implied obligation to exercise good faith not to

frustrate the contracts into which they have entered.") (citations omitted).
Indeed, "[i]n New York, all contracts imply a covenant of good faith and fair
dealing in the course of performance. This covenant embraces a pledge that
'neither party shall do anything which will have the effect of destroying or
injuring the right of the other party to receive the fruits of the contract.'
While the duties of good faith and fair dealing do not imply obligations
'inconsistent with other terms of the contractual relationship,' they do
encompass 'any promises which a reasonable person in the position of the
promisee would be justified in understanding were included.'" *511 West
232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 773 N.E.2d 496
(Ct. App. 2002) (internal citations omitted). A parties' conduct does not
breach the covenant if it amounts to an act in self-interest having only an
incidental effect on the other parties' interests.[18]

The Bankruptcy Court's reasoning bears no resemblance to the legal
standards applied by New York Courts under the covenant.

- The Bankruptcy Court failed to frame the proper question
under New York Law: Whether Solutia performed its obligations in
compliance with a covenant implied in all contracts. Instead, the
Bankruptcy Court held the covenant to be irrelevant merely because
there was no "explicit provision prohibiting [Solutia's] action" and
because of its erroneous construction of the "plain and clear" meaning
of the Indenture.

---

[18] "[T]he implied covenant does not extend so far as to undermine a party's 'general right
to act on its own interests in a way that may incidentally lessen' the other party's
anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134,
136 (2d Cir. 1990) (*citing Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g.
Co.*, 30 N.Y.2d 34, 46 (1972).

- The Bankruptcy Court never addressed the first question courts must ask when applying the covenant to a party's conduct: Whether Solutia's actions "had the effect of destroying or injuring the rights of [Noteholders] to receive the fruits of the contract."  The Memorandum Decision contains no analysis of this question.  The record established by uncontroverted evidence that Solutia released the lien in contemplation of depriving the Noteholders of the bargained-for fruits of the Indenture, their protection from a senior material lien arising in the Protected Assets.

- The Bankruptcy Court never addressed the second element of the covenant:  Whether Solutia's actions to release the Noteholders' lien in contemplation of granting a material senior lien, breached a "promise that a reasonable person in the position of [the Noteholders] would be justified in understanding was included."  The record established that it was reasonable for Noteholders to expect their lien would not be released in a deleveraging strategy that specifically contemplated a material senior lien arising in the Protected Assets.

- The Bankruptcy Court declined to evaluate whether Solutia's conduct could be excused under the covenant because it amounted to no more than a self-interested act having only an incidental effect on the Noteholders' interests.  The record established that the release of the Noteholders' lien was intended, via the deleveraging strategy, not to have an "incidental" effect, but to do away entirely with the protection of Section 1008.

### 2. The Bankruptcy Court Erred by Holding the Covenant of Good Faith and Fair Dealing Did Not Apply.

The Bankruptcy Court's error in construing Section 1008 of the Indenture led it to apply an erroneous legal standard under the covenant. The Bankruptcy Court held that Solutia's actions did not beach the covenant and were not prohibited by "an explicit provision prohibiting [its] actions." [Memorandum Decision at 27]. Courts applying New York law, with considerable frequency, found that the covenant may be breached even where the conduct in question is not expressly prohibited. *See, e.g., Travellers Int'l v. Trans World Airlines, Inc.*, 41 F.3d 1570 (2d Cir. 1994) ("Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith.") (*citing Carvel Corp. v. Diversified Mgmt. Group, Inc.*, 930 F.2d 228, 231 (2d Cir. 1991); *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989)). Further, the Court repeated its erroneous construction of Section 1008 in holding that the application of the covenant of good faith and fair dealing was precluded because the Noteholders' lien was released automatically under the "plain and clear" meaning of the Indenture.

The Bankruptcy Court held that because the Indenture had this "plain and clear meaning," the covenant of good faith and fair dealing did not apply. [Memorandum Decision at 27]. Under the case law, the covenant of good faith and fair dealing is implied in contracts regardless of whether the contract is ambiguous. To the Bankruptcy Court, the covenant became muddled with the question whether a contract's meaning should be interpreted by its language, as opposed to other evidence. The covenant of good faith and fair dealing applies universally, and is intended to effectuate the meaning of the

-40-

contract, rather than to resolve ambiguity. The distinction is best illustrated in the words of the Appellate Division:

> It is a primary rule of contract construction that where the terms of a written agreement are clear and unambiguous, the intent of the parties must be drawn from the contract language (citing cases). This is so because 'it is not the function of the courts to remake the contract agreed to by the parties, but rather to enforce it as it exists (citing case). *In achieving that end*, due regard must be given the overriding principle that every contract contains an implied covenant of good faith performance and fair dealing (citing cases). Moreover, that a specific promise has not been expressly stated does not always mean that it was not intended. "[The] undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included. (citing authority)."

*Havel v. Kelsey-Hayes Co.*, 445 N.Y.S.2d 333 (4th Dep't 1981) (emphasis added); s*ee also, Don King Production, Inc. v. Douglas*, 742 F. Supp. 741 (S.D.N.Y. 1990) (Under New York law, "[t]he covenant is violated when a party to a contract acts in a manner that, *although not expressly forbidden by any contractual provision*, would deprive the other of the right to receive the benefits under their agreement.") (emphasis added).

> ### 3.    The Bankruptcy Court Erred by Declining to Analyze Whether Solutia's Conduct Deprived Noteholders of the Bargained–For Fruits of the Indenture.

"A party's actions may implicate the implied covenant of good faith when it acts so directly to impair the value of the contract for another party that it may be assured that they are inconsistent with the intent of the parties." *Bank of China v. Chan*, 937 F.2d 780 (2d Cir. 1991) (*citing M/A-COM Sec. Corp.*, 904 F.2d at 136). "This covenant embraces a pledge that 'neither party

shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *511 West 232nd*, 98 N.Y. 2d at 153; *accord*, *Dalton v. Educ. Testing Services*, 87 N.Y.2d 384, 389 (Ct. App. 1995).

As indicated above, Section 1008 of the Indenture supplies protection to the Noteholders in providing that the Trustee's claims shall be equally and ratably secured if Solutia's secured obligations to third parties exceeds the materiality threshold. [PX 3, § 1008 at 44-45]. The protection of Section 1008 is comprehensive, extending to *any* kind of third party borrowing by means of granting *any* kind of security, regardless of form. The trial record established that the effect of Solutia's conduct was to deprive the Noteholders of the benefit of Section 1008 of the Indenture. Solutia developed the deleveraging strategy precisely to position itself to borrow against the Protected Assets in an amount far in excess of the materiality threshold while the Notes remained unsecured. Solutia identified this coyly as "rationalizing" its use of the Protected Assets as collateral. Further, Solutia's deleveraging strategy was developed to pursue the goal of a debt-equity conversion where the Noteholders (and other unsecured creditors) would receive stock in Solutia in satisfaction of their debt claims, while Monsanto received stock in exchange for assuming a portion of the Legacy Liabilities. Solutia's lead financial advisor at Rothschild had advised that Noteholders would have no incentive to make such an exchange when they no longer had the benefit of this lien on the Protected Assets. Yet, by its error, the Bankruptcy Court never assessed whether the release, as it most certainly did, deprived Solutia of the bargained-for fruits of Section 1008 of the Indenture. [*See* Memorandum Decision at 22-27].

4.    **The Bankruptcy Court Erred by Declining to Analyze Whether Solutia's Conduct was Contrary to the Noteholders' Reasonable Expectations.**

"The undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Havel v. Kelsey-Hayes Co.*, 83 A.D. 2d at 380 (*citing* 11 *Williston on Contracts* § 1295 (3d ed.)); *accord*, *Dalton v. Educ. Testing Service*, 87 N.Y. 2d at 389; *Bank of China*, 937 F.2d at 789; *Shamis v. Ambassador Factors Corp.*, No. 95 CIV 9818, 2000 W.L. 1368049 (S.D.N.Y. Sept. 21, 2000), *rev'd in part on other grounds*, 54 Fed.Appx. 516 (2d Cir. 2002); *Interallianz Bank AG v. Nycal Corp.*, No. 93 CIV. 5024, 1994 WL 177745 (S.D.N.Y. May 6, 1994) ("'Neither party to a contract shall do anything.' . . . to violate the [other] party's presumed intentions or reasonable expectations."); *Mellencamp v. Riva Music Ltd.*, 698 F.Supp. 1154, 1157 (S.D.N.Y. 1988) ("A contract is also deemed to include any promise which a reasonable person in the position of the promise would be justified in believing was included.") (*citing Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62 (1978)).

The Bankruptcy Court made an error of law by declining to consider whether Solutia's conduct breached a promise respecting the reasonable expectations of Noteholders.  For example, a reasonable bondholder would be justified to expect Solutia would not reduce its liquidity below its needs by entering into a financing specifically designed to limit a lien on Protected Assets to exactly $1,000 less than the materiality threshold [DX 6, at Security Agreement; PX 76, § 5.01(d)(iii); Adv. Docket No. 118 at 80:5-81:17], while at the same time arranging to obtain far higher borrowings secured by the Protected Assets in bankruptcy loans [PX 20; PX 43 at 2 (confirming on

-43-

October 17, 2003, that the Debtors wanted to be "prepared to proceed with the Step II transaction as early as late next week.")], all as part of a deleveraging strategy aimed at converting the Notes into equity [PX 152; Adv. Docket Nos. 108 at 18:14-20:18; 120 at 84:14-85:11; 112 at, 109:7-112:8, 189:21-190:7]. A reasonable bondholder would not expect Solutia to pursue its deleveraging strategy after being rebuffed by two mainstream lenders who refused to participate because of the expected adverse reaction of the Noteholders and their bondholder customers generally. [PX 182 at 40-41; *see also*, Adv. Docket Nos. 26 at 4; 105 at 40:16-42:21; 108 at 54:10-58:14] Solutia's awareness of bondholder expectations is revealed by its repeated efforts to conceal its conduct from Noteholders. It avoided involving the Trustee in the release. [PX 4; PX 78]. Solutia's financial advisors identified the principal Noteholders months before the lien was released [PX 70; Adv. Docket No. 156 at 44:1-48:18], yet refrained from communicating with them about the restructuring until afterwards. [PX 152]. Solutia provided Citibank with a nuanced "reasoned opinion" of its bankruptcy counsel revealing serious legal doubt as to the propriety of the release of the lien given Solutia's extensive preparations for bankruptcy. [PX 77]. Yet, the entire body of evidence respecting the expectations of Noteholders was precluded from consideration by the Bankruptcy Court's errors of law.

### 5.    The Bankruptcy Court Misapplied The Law in the Memorandum Decision.

The Bankruptcy Court's errors of law are drawn in high relief in its striking misapplication of two authorities cited at length in the Memorandum Decision: *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504 (S.D.N.Y. 1989) and *Hartford Fire Ins. Co. v. Federated Department Stores,*

*Inc.*, 723 F. Supp. 976 (S.D.N.Y. 1989).  In *Metropolitan Life*, an indenture stated that RJR Nabisco could "consolidate with, or sell or convey, all or substantially all of its assets to, or merge into or with any other corporation," as long as the surviving entity was a U.S. corporation and assumed its debt. 716 F. Supp. at 1510.  RJR Nabisco concluded a merger meeting the criteria of this express term.  The Court held that doing so did not violate the covenant of good faith and fair dealing.  *Id*. at 1516-22.  The Indenture contained no equivalent language authorizing release of the Noteholders' lien.[19]

The *Metropolitan Life* decision is distinguishable for another important reason.  Unlike the Memorandum Decision of the Bankruptcy Court, Judge Walker's opinion in *Metropolitan Life* deliberately and meticulously analyzed the plaintiffs' claim under each element set down the controlling authority governing the established standards of the covenant of good faith and fair dealing.  The District Court wrote that it "[stood] ready to employ an implied covenant of good faith to ensure that . . . bargained-for rights are performed and upheld" but that would not "shoehorn into an indenture *additional terms* [the] plaintiffs now wish had been included."  *Id*. at 1519 (emphasis added). The Trustee and Noteholders did not ask the Bankruptcy Court to add terms to the Indenture.  Their demand for relief was grounded in a specific term of the Indenture and the bargained-for benefits thereunder.  Yet, the Bankruptcy Court never undertook to compare Solutia's conduct to the "bargained-for fruits" of Section 1008 but rather cut off the necessary inquiry via its errors of law.

---

[19]   The only basis of the Indenture cited by the Bankruptcy Court was the term it erroneously construed to provide for automatic creation and release of liens. [Memorandum Decision at 21].

The Bankruptcy Court's reliance on *Hartford* was flawed for the same reason. *Hartford* also dealt with a bondholder challenge to a merger. The indenture in *Hartford* stated "[n]othing contained in this [i]ndenture or in any of the [s]ecurities shall prevent any consolidation or merger . . . with or into any other corporation," 723 F. Supp. at 991, and stated certain conditions to a merger (which it was conceded were met) and then repeated that "[n]othing contained in this [i]ndenture or in any of the [s]ecurities shall prevent the [issuer] from merging into itself any other corporation (whether or not affiliated with the [issuer])." *Id.* at 992. Not surprisingly, the District Court found the indenture provided no "bargained-for" protection from the harmful effect of a merger. *Id.* As with *Metropolitan*, the fact pattern in *Hartford* bears no resemblance to this case. The Noteholders had the protection of a specific term barring material senior liens. Solutia set out to, and then did, defeat that protection by its conduct.

The Bankruptcy Court's erroneous conclusion that the lien release did not implicate Noteholders' rights under the Indenture surfaced again in its curt dismissal of the Trustee's legal authorities. The Second Circuit decision in *Van Gemert v. Boeing Co.*, 520 F.2d 1373 (2d Cir. 1975) was controlling authority for the proposition that Solutia was required to act reasonably in exercising whatever discretion it may have had under the Indenture. In *Van Gamert*, the Second Circuit reversed a District Court's dismissal of a complaint by debentureholders alleging that notice of an opportunity to exercise a right to convert the debentures into common stock was inadequate **even though the issuer complied with the indenture**. *Id.* at 1383. The District Court **rejected** the issuer's **caveat emptor** argument that "the risk that actual notice might not be received by subsequent holders of the debentures

was clearly accepted by all even remotely familiar with the nature of such debentures." *Id*. at 1379.  In *Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R. Co.*, 680 F.2d 933 (3d Cir. 1982), the Third Circuit reversed dismissal of a complaint by bondholders, holding that an issuer should have given notice of an opportunity to convert debentures into common stock before it paid a dividend.  The indenture did not require the notice, since the notice requirement arose when dividends were to be paid in stock of the issuer itself and the intended dividend was to be paid in stock of a subsidiary.  *Id*. at 936-37.  Applying New York law, the Third Circuit held that the defendants breached the covenant anyway.  This was not because of any express term of the indenture but because "[the issuer] . . . took steps to prevent the [b]ondholders from receiving information which they needed in order to receive the fruits of their conversion option should they choose to exercise it." *Id*. at 941.

The Bankruptcy Court cited other authorities, none of which supported its erroneous legal standards under the covenant of good faith and fair dealing.  For example, in *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329 (1987), the Court of Appeals held that the covenant does not apply to a common-law contract for at-will employment.  *Id*. at 337.  Three other cases cited by the Bankruptcy Court are inapposite because they simply hold that the covenant does not prevent lenders from exercising expressly defined remedies upon default.[20]  The Bankruptcy Court's reliance on *Suthers v. Amgen, Inc.*, 441 F.Supp.2d 478 (S.D.N.Y. 2006), was also misplaced.  In that

---

[20]  *State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 246 F.Supp.2d 231 (S.D.N.Y. 2002); *Nat'l Westminster Bank v. Ross*, 130 B.R. 656 (S.D.N.Y. 1991); *Downtown Athletic Club, Inc. v. Caspi Dev. Corp.* (*In re Downtown Athletic Club, Inc.*), No. 98 B 41419, 1998 WL 8598226 (Bankr. S.D.N.Y. Dec. 21, 1998).

case, the District Court dismissed a complaint where the plaintiff sought to apply the covenant when he lost free medication supplied by a drug maker after a drug trial ended.  The patient had signed a consent agreement stating his involvement might end upon "termination or cancellation of the study. . . ."  *Id*. at 484.  The Second Circuit held that the implied covenant, under the circumstances, "does not 'add to the contract a substantive provision not included by the parties.'"  *Id*. at 485 (*citing Broder v. Cablevision Sys. Corp*.*,* 418 F.3d 187, 198-199 (2d Cir. 2005).  Here, the Trustee and Noteholders never sought to add anything to the Indenture, but rather sought to undo conduct that deprived the Noteholders of the benefits of a vital protective covenant.

## VII.  CONCLUSION

For the above stated reasons, the Judgment should be reversed and remanded to the Bankruptcy Court for a determination of appropriate remedies.

Dated:  August 8, 2007                    HENNIGAN, BENNETT & DORMAN LLP


By:        */s/ Bennett J. Murphy*

BRUCE BENNETT
BENNETT J. MURPHY
JOSHUA D. MORSE
865 S. Figueroa Street, Suite 2900
Los Angeles, California 90017

Attorneys for Appellant *Ad Hoc* Committee of Solutia Noteholders